**Opinion issued September 26, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00202-CV

———————————

## CHARLES R. SADEN, Appellant

## V.

## BRIAN SMITH, Appellee

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-00593**

---

# O P I N I O N

Charles R. Saden and Brian Smith were the sole shareholders of POS Card

Processing, Inc. Saden appeals from a judgment against him for breach of contract

and breach of fiduciary duty arising from actions taken in connection with his

management of the company.  Smith moved to dismiss this appeal for want of jurisdiction, while Saden raised four appellate issues, alleging: (1) Smith lacked standing to recover damages for injuries to the corporation; (2) the trial court erred by not requiring Smith to elect a remedy; (3) the trial court erred in rendering judgment for breach of fiduciary duty because Saden owed Smith no fiduciary duty individually; and (4) the trial court erred in rendering judgment on claims not submitted to the jury.

We conclude that we have jurisdiction over this appeal.  We reverse the trial court's judgment to the extent that it permitted duplicative recovery of damages and included additional unauthorized findings, and we remand to the trial court to allow Smith to elect a remedy and for entry of a new judgment.

## I.    Appellate jurisdiction

After the jury's verdict but before the trial court entered judgment, Saden informed the court that he had filed for bankruptcy and that the automatic bankruptcy stay applied to all further matters in the case.  The bankruptcy court converted Saden's bankruptcy from a reorganization proceeding under Chapter 11 to a liquidation proceeding under Chapter 7, and it appointed a bankruptcy trustee. The bankruptcy court granted Smith's motion for relief from the automatic stay to continue the state court litigation.  The order stated:

> [It is] ORDERED that the automatic stay pursuant to 11 U.S.C. § 362 is modified to permit the continuation of the State Court

2

Lawsuit, specifically the automatic stay is modified to allow the state court to enter judgment as to liability and to award damages on of Movant's claims against the Debtor and the Debtor's claims against the Movants and allow the parties to prosecute any appeals of the final judgment, provided, however, the automatic stay shall not be modified to allow enforcement of such judgment against the Debtor or pursue any right to collection against the Debtor that may arise out of the State Court Lawsuit . . . .

(Footnote omitted.)

The trial court then rendered judgment on the jury's verdict. On Smith's breach of contract claim, the trial court awarded $941,907, plus prejudgment interest and attorney's fees. For Smith's breach of fiduciary duty claim the trial court awarded an additional $393,000 in actual damages (plus prejudgment interest), as well as $941,907 (plus prejudgment interest) in equitable disgorgement of the profits "found by the jury to have been obtained by [Saden] as a result of his acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity with respect to [Smith]." Saden filed a motion for new trial, a motion for judgment notwithstanding the verdict, and a motion to modify, correct, or reform the judgment. Saden's motions were overruled by operation of law, and he timely filed a notice of appeal.

Smith filed a motion to dismiss the appeal for lack of appellate jurisdiction, arguing that the bankruptcy trustee had exclusive standing to pursue an appeal of the adverse judgment, and because the trustee did not file a notice of appeal, this court lacks appellate jurisdiction. In response, Saden pointed out that the

3

bankruptcy court allowed the appeal to proceed by its order that modified the automatic stay to allow the trial court to enter judgment and authorized "the parties to prosecute any appeals of the final judgment." Saden also noted that the bankruptcy court, in the course of declining to discharge the debt, has rejected Smith's argument in a "Judgment of Non-Dischargeability," which provided:

> For the reasons set forth on the record of February 10, 2011, Charles R. Saden's liability under the judgment of the 270th Judicial District Court of Harris County, Texas in Cause 2009-00593 is excepted from discharge pursuant to 11 U.S.C. § 523.

> If the state court's judgment is reversed or modified on appeal, this Court will reconsider this judgment pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure.

Finally, Saden argues that he has standing because a state-court judgment cannot be collaterally attacked in the bankruptcy court, and the bankruptcy court in this case relied on the state-court judgment against him, which recited the trial court's findings that he committed acts of fraud, defalcation, and embezzlement, in holding that the $3 million judgment underlying this appeal is not dischargeable in bankruptcy. He argues that a conclusion that the Bankruptcy Code's automatic stay terminates his standing to challenge the otherwise unreviewable state-court judgment that is the basis of the nondischargeability holding is "circular reasoning and would be a denial of constitutional rights of due process and due course of law."

4

Meanwhile, after Smith filed his motion to dismiss in this court, Saden filed in the bankruptcy court an emergency motion to confirm his authority to appeal the state-court judgment. The bankruptcy court issued an order which provided:

> The Court cannot, should not and will not determine whether the First Court of Appeals has jurisdiction over Saden's notice of appeal. That is a matter left solely to the Texas courts.
>
> The principal case cited by Brian Smith in opposition to the Debtor's motion is *In re Mozer*, 302 BR 892 (C.D. Cal. 2003). Mozer indeed deals with a similar situation as the present one—but with a major distinction. The state court findings in Mozer were insufficient to establish an exception to discharge:
>
>> However, sale of the Defensive Appellate Rights by her Trustee is not literally nor is it tantamount to a waiver of dischargeability by the Trustee. *The underlying judgment against Mozer, even if final, is not prima facie non-dischargeable. Mozer has represented to this Court that "additional facts would need to be established and that the debt would not be non-dischargeable even if the state court judgement were to become final."* (Appellants' Opposition to Shorten Briefing Schedule and Waive Oral Argument, p. 2). To be sure, sale of the Defensive Appellate Rights may be unhelpful to her in defeating a non-dischargeability claim, but she is in no worse position than if she were permitted to pursue the state court appeal and lost.
>
> *Id.* (emphasis added).
>
> In this case, the opposite is alleged and the Court has already determined that the state court judgment bars further litigation over whether the claim is excepted from discharge. Accordingly, to the extent that the automatic stay bars Saden from pursuing his appeal for the purposes of challenging findings that adversely affect his discharge, the stay is modified.

By modifying the stay, this Court expresses no view on whether the First Court of Appeals has jurisdiction over Saden's appeal.

Subject-matter jurisdiction is essential to the authority of a court to decide a case and is never presumed. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993); *see also Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). Standing is a necessary component of subject-matter jurisdiction and cannot be waived. *Blue*, 34 S.W.3d at 553–54. If a party lacks standing, the trial court does not have jurisdiction to hear the case. *Id.* A party has standing only when he raises "an actual, not merely a hypothetical or generalized grievance." *Brown v. Todd,* 53 S.W.3d 297, 302 (Tex. 2001); *see also Texas Ass'n of Bus.*, 852 S.W.2d at 443 (explaining that concept of standing arises from separation of powers and constitutional prohibition on the issuance of advisory opinions).

The filing of a voluntary petition for bankruptcy impacts the issues of standing and jurisdiction due to the creation of the bankruptcy estate and the automatic stay. When a debtor voluntarily files a petition for bankruptcy, an "estate" is created, comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541 (2012). This includes causes of action or legal claims that belonged to the debtor before the petition was filed. *Douglas v. Delp*, 987 S.W.2d 879, 882 (Tex. 1999); *Hous. Pipeline Co. LP v. Bank of Am., N.A.*, 213 S.W.3d 418, 424–25 (Tex. App.—

6

Houston [1st Dist.] 2006, no pet.); *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008).

The filing of a bankruptcy petition further operates as a stay of the "continuation . . . of a judicial . . . action or proceeding against the debtor that was . . . commenced before the commencement of the [bankruptcy] case." 11 U.S.C. § 362(a)(1). "The automatic stay deprives state courts of jurisdiction over the debtor and his property until the stay is lifted or modified." *Hous. Pipeline Co.*, 213 S.W.3d at 428–29 (internal quotations omitted). Thus a judgment rendered in derogation of the automatic bankruptcy stay is void. *York v. State*, 373 S.W.3d 32, 38–40 (Tex. 2012) (approving holding in *Cont'l Casing Corp. v. Samedan Oil Corp.*, 751 S.W.2d 499, 501 (Tex. 1988)).

Smith moved to dismiss the appeal for want of jurisdiction based on Saden's alleged lack of standing to initiate an appeal after his bankruptcy filing, which vested exclusive standing in the trustee. In response, Saden argues that he has standing because of the bankruptcy court's non-dischargeability determination and because of the order that modified the automatic bankruptcy stay. Thus, in determining our jurisdiction, we must ascertain whether (1) Saden has standing to appeal the state-court judgment and (2) the assumption of jurisdiction would violate the automatic stay.

While discharge in bankruptcy under Chapter 7 extinguishes a debtor's personal liability for a debt, *see Johnson v. Home State Bank*, 501 U.S. 78, 82–83 (1991), a "debtor remains personally responsible for any debt not discharged in bankruptcy." *In re Cousins*, 209 F.3d 38, 40 (1st Cir. 2000). Here, the bankruptcy court's judgment of non-dischargeability—applying bankruptcy law to the state-court judgment—means that despite his bankruptcy filing Saden continues to retain a pecuniary interest in the outcome of this case. He is personally, actually aggrieved by the trial court's judgment, which affects the scope of the discharge of his liabilities in bankruptcy. *See Brown*, 53 S.W.3d at 302. Accordingly we conclude that Saden maintains standing to maintain this appeal despite the pending bankruptcy proceeding.

We also have subject-matter jurisdiction to decide the appeal in light of the bankruptcy court's modification to the automatic stay of bankruptcy to permit the parties to prosecute any appeals of the final judgment. Thus, our assumption of jurisdiction in this case does not violate the stay. *See Hous. Pipeline Co.*, 213 S.W.3d at 428–29; *see also York*, 373 S.W.3d at 38–40. This modification necessarily authorized the filing of postjudgment motions necessary to preserve issues for appellate review under our procedural rules. *See, e.g.*, TEX. R. CIV. P. 324(b). Saden's timely filed post-judgment motions extended the timeline for filing his notice of appeal, which was also timely filed. *See* TEX. R. APP.

8

P. 26.1(a). Saden's timely filing of a notice of appeal invoked this court's jurisdiction. *See* TEX. R. APP. P. 25.1(b).

We hold that Saden has standing, and we otherwise have jurisdiction over this appeal. Accordingly, we deny Smith's motion to dismiss the appeal.

## II. Saden's appeal on the merits

Appellee Brian Smith is the owner of Cash Register Sales and Service of Houston, Inc., which does business as CRS, Texas. The company was founded by Smith's father more than 30 years ago to sell cash registers, and in more recent years it sold "point of sale systems" commonly used in restaurants. Appellant Charles Saden worked as a salesman for a company in the business of processing credit card payments. Saden called on CRS, Texas to solicit leads or referrals for customers in 1999, which is when he first met Smith. From 1999 to 2001, Saden and Smith worked together on such deals, but in 2001 Saden resigned from his job and approached Smith about forming a new credit card processing company.

Smith agreed and contributed $10,000 to enable the newly formed company to pay for an affiliation with National Processing, which would allow the company to enter the credit card processing market. Smith testified that he did not mind being the only one to contribute money because he knew that Saden was unemployed.

9

Smith testified that they agreed that Saden would run the business. "His position would be the president and everything from top to bottom. Obviously, if it's just Chuck and I, I was president of CRS, Texas, and that was my full-time job so Chuck's responsibility would be to run the company and to make it grow." Smith said, "I was to be a silent partner, I was not involved in working there day-to-day." But he also said that he brought expertise and experience in the point-of-sale business to the venture. In particular, Smith's point-of-sale customers needed card processing services, so he brought the potential to generate business by referring customers to the new company. Smith said that Saden was bringing "[h]is experience and knowledge in the credit and processing business. This is what he was experienced in so he was going to facilitate in helping to grow the POS Card Processing business."

In 2001, Saden and Smith formed and became co-owners in POS Card Processing, Inc. POS sold terminals for card processing and facilitated processing agreements between merchants and banks. It generated revenue by receiving a fraction of the fees that the bank charged on each card transaction. POS initially received its share of the fees by check and later by direct deposit into a bank account.

Saden and Smith each owned a 50% share of POS, and both were directors of the company. Smith testified:

From the onset it was a 50/50 deal. We were to be paid equally, the board, me and him, it required us both to agree.

. . . .

I was half owner of the company, and the agreement was we would share equally in the revenues that POS Card Processing generated.

. . . .

We would be paid equally, we were 50 percent owners.

Saden was appointed president of POS and chairman of the board of directors, and Smith was appointed as secretary and treasurer. They agreed in writing that "until further action of the Directors, no Director of the Corporation shall receive a salary in such capacity" and that the directors and officers were authorized to hire and supervise employees and independent contractors to accomplish the goals of the business. However, Smith testified that he understood that they would hire only independent contractors. And the bylaws included the following provision:

**3.01 <u>Powers.</u>** The Directors shall act only as a board and an individual Director shall have no power as such. All corporate powers of the corporation shall be exercised by or under the authority of the Board of Directors and the business and affairs of the corporation shall be controlled by the Board of Directors subject to such limitations as are imposed by law, the articles of incorporation or these Bylaws regarding actions to be authorized or approved by the shareholders. The Board of Directors may by contract or otherwise give general, limited or special power and authority to agents of the corporation to transact any special business requiring such authorization.

11

Saden agreed that, as directors, neither he nor Smith could unilaterally enter into a management contract. Rather, the articles of incorporation, bylaws, and minutes of annual meetings indicated that they had to take such actions together as board of directors. Smith testified that the arrangement required them "to discuss and . . . to come to agreements together, not acting independently or separately from each other." However Saden repeatedly testified that the parties varied their initial agreement by later verbal agreements, and that they did not operate the business in accordance with the articles of incorporation and bylaws. He said, "Everything about this case is all about verbal agreements . . . ."

For example, Saden testified that he and Smith had a verbal agreement that in the first year of POS's existence, Saden was entitled to all of the profits from the sale of card processing terminals. But Smith testified that he never had a conversation with Saden about his keeping the equipment sales revenue for himself. Both Saden and his adult daughter, Charlyn, received salaries from POS. Saden testified that the board of directors "verbally agreed" to pay the salaries. But Smith said they only discussed Charlyn working on commission, not for a salary. Smith testified that he first learned during the course of litigation that POS had been paying Saden and Charlyn salaries, which Smith called "exorbitant." Saden testified that Smith verbally agreed that POS would pay Saden's expenses

12

for attending a trade show. But Smith said that he did not agree to that and that he expected Saden to pay his own expenses to attend the show, just as he did.

POS had a bank account with Klein Bank, which later became Amegy Bank. Initially, POS received its share of card processing fees by direct deposit into this bank account. While Smith testified that from 2001 to September 2008, CRS, Texas exclusively referred its customers to POS for services, Saden testified that he had grown frustrated by Smith's lack of interest and participation in the business. Saden testified that CRS, Texas was not referring business and, therefore, he was generating the business on his own. So Saden began doing business separately as "Precision Payment Company," engaging in exactly the same line of business as POS. Saden created a bank account at Klein Bank in his own name for this purpose.

From that point on, Saden engaged in a course of action that caused revenue from existing and new POS clients to be deposited in his personal bank account at Klein Bank. At trial, Saden did not deny that he had engaged in such actions. He conceded he created fraudulent checks bearing the POS name and his personal checking account number. And he conceded that he diverted money that should have gone to POS's bank account into his own account, falsified the POS records so it would appear that lesser amounts were being deposited into the POS account from bank agents who processed the credit card transactions, and failed to inform

13

Smith of or lied to him about the amount of money that POS was earning. Saden did not distribute POS revenue equally. For example, Saden testified that in 2002 he paid himself $63,000 and paid Smith only $10,000.

Saden said that, despite his conduct, Smith earned more money than he would have under prior business arrangements. He blamed Smith for not being aware of his wrongful conduct. At trial, Saden was questioned about his "skimming off the top" of the POS accounts:

> Q.   Did you think that's something that your business partner would want to know?
>
> A.   If he wanted to participate and get to know things he could have spent a lot more time involved in the operation, including referring like kind businesses.
>
> Q.   So, your position is then hey, if he had gotten more involved he would have caught this theft but shame on him for not getting more involved?
>
> A.   He was secretary-treasurer and he certainly didn't have an idea of what was going on in the corporation.
>
> . . . .
>
> Q.   You're not telling the ladies and gentlemen of the jury that you told Mr. Smith you were skimming this money off the top, are you?
>
> A.   I didn't tell Mr. Smith I was skimming off of the account.
>
> Q.   You didn't tell him, hey I'm getting 100 percent over here and I'm going to give 60 percent of that to POS, did you?
>
> A.   I can't remember that conversation.

14

Q.   Right. But so you would then decide, to use my example, if you got 50 or 60 in one particular month you would then write a check over to POS, put it in their bank account and say 25. Right?

A.   They got what they deserved.

Smith testified that he "relied totally" on Saden with respect to his expectations of revenue and growth of POS. Early on, he did not review the company's books. He received monthly checks for what he believed was his portion of the revenue, but he discovered during the course of litigation that Saden never followed the parties' agreement that both directors would be paid equally. He testified that he first learned during the litigation of many of Saden's actions, including his creation of Precision Payment Company and that he had deposited POS money in his personal account. Smith also first learned in litigation that Saden sold two separate POS account portfolios for far more than he deposited into POS accounts or told Smith (one for $92,000 and the other for $286,000, but in each case the amount actually received by POS was approximately $53,000 to $54,000).

Around July 2008, after Smith had sought but not received additional information about the management and finances of the business, he and Saden, who was also unhappy with the arrangement, discussed ending the business. They met again in September 2008, and Smith asked for an accounting. Saden provided

some information, but he did not give Smith "source information" that would have shown which processor deposited which amounts at which times. Smith said, "I think his attitude was like this is all you're going to get. I knew we weren't getting too terribly far with that information. I left with maybe ten pages of printout and that was it."

Smith ultimately sued Saden for, among other things, breach of contract and breach of fiduciary duty. Smith alleged that he was bringing his claims both in his personal capacity and in a derivative capacity as a shareholder of POS. He alleged that Saden breached a fiduciary duty owed to him personally because POS was operated as a partnership, the articles of organization and by-laws of POS vested control of the company in Saden and gave rise to a contractual fiduciary duty, and the circumstances surrounding the creation and operation of POS gave rise to a confidential relationship between Saden and Smith. As to his personal breach of contract claim, Smith alleged that Saden breached his "contractual obligations, and Smith's contractual rights, under the several agreements signed by the parties; including without limitation, the articles of organization and the by-laws of POS."

The case was tried to a jury. At trial, both Saden and Smith testified, among other things, about their history of working together, the formation and operation of POS, and their agreement as to sharing revenue. Smith also presented the testimony of Bill Shields, an accountant who analyzed POS and Precision

16

accounting records, including balance sheets, profit and loss statements, general ledgers, and tax records. The accounting spreadsheets that formed the basis for his testimony were admitted into evidence. Based on information he received from Smith, Shields assumed that the parties' agreement required an equal division of revenues, and his analysis did not credit Saden for expenses which were disputed by Smith. Shields testified that between 2002 and 2008, POS had actual revenue of $3.77 million, and in addition to that, $2.41 million was diverted from POS to Precision. Shields explained his calculations and the spreadsheets that were admitted into evidence at trial. He calculated the amount of money which in his opinion was due to Smith, based on sharing the revenues but not the disputed expenses, and including revenue diverted to other entities that should have accrued to POS. Based on his calculations, Shields testified that Saden owed Smith $941,907. Shields also testified that $941,907 "represents the excess portion of the income that was either received by or directed to the benefit of Saden." He said that $941,907 was "solely" what Smith was entitled to receive.

Shields also testified about the expenses charged to POS. Although POS had gross income of $3.77 million, it turned a total profit of only approximately $4,000 over the relevant years. He explained that the money Saden had paid to himself and family members, including personal living expenses, accounted for the entire difference between the company's revenue and its profit.

17

Two causes of action against Saden—breach of contract and breach of fiduciary duty—were submitted to the jury. The breach of contract questions asked:

**QUESTION NO. 1**

Did Brian Smith and Charles Saden agree to equally split the revenues, less reasonable and necessary expenses, derived from the business agreed to be conducted by POS?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

If your answer to Question No. 1 is "Yes," then answer the following question. Otherwise, do not answer the following question.

**QUESTION NO. 2**

Did Charles Saden fail to comply with the agreement?

. . . .

**QUESTION NO. 4**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Brian Smith for his damages, if any, that resulted from Charles Saden's failure to comply with the agreement?

Lost profits that are a natural, probable, and foreseeable consequence of Chuck Saden's failure to comply with the agreement.

Answer in dollars and cents if any.

Saden objected to Question No. 1 on the grounds that there was no evidence of reasonable and necessary expenses and there was no definition of reasonable and

18

necessary expenses. The trial court overruled both objections. Neither party objected to questions 2 or 4.

The relevant breach of fiduciary duty questions asked:

**QUESTION NO. 8**

Did Charles Saden comply with his fiduciary duties to Brian Smith?

Because a relationship of trust and confidence existed between them, Charles Saden owed Brian Smith a fiduciary duty. To prove he complied with his duty, Charles Saden must show:

a. The transactions in question were fair and equitable to Brian Smith;

b. Charles Saden made reasonable use of the confidence that Brian Smith placed in him;

c. Charles Saden acted in the utmost good faith and exercised the most scrupulous honesty toward Brian Smith;

d. Charles Saden placed the interests of Brian Smith before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Brian Smith, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

e. Charles Saden fully and fairly disclosed all important information to Brian Smith concerning the transactions.

. . . .

If your answer to Question No. 8 is "No," then answer the following question. Otherwise do not answer the following question.

19

# QUESTION NO. 10

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Brian Smith for his damages, if any, that were proximately caused by Charles Saden's failure to comply with his fiduciary duties to Brian Smith?

"Proximate cause" has two parts:

1. A proximate cause is a substantial factor that in a natural and continuous sequence brings about an event and without which the event would not have occurred; and

2. A proximate cause is foreseeable. "Foreseeable" means that a person using ordinary care would have reasonably anticipated that his acts or failure to act would have caused the event or some similar event.

There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate for the same loss twice, if any.

Lost profits that are a natural, probable, and foreseeable consequence of Chuck Saden's failure to comply with his fiduciary duties to Brian Smith.

. . . .

If your answer to Question No. 8 is "No," then answer the following question. Otherwise, do not answer the following question.

# QUESTION NO. 11

What was the amount of Charles Saden's profit from the conduct, if any, that you have found to be a breach of Charles Saden's fiduciary duties to Brian Smith?

Smith objected to the omission of separate questions pertaining to his derivative claims for breach of fiduciary duty, and he requested their inclusion. The trial court denied these requests. Saden made the following objections to questions 8, 10, and 11:

Defense counsel: Defendants also object to Question No. 8 in the jury charge. The existence—first of all, defendants object to the inclusion of an informal fiduciary duty because there is no evidence of a confidential relationship that predates the POS transaction and for that reason we don't believe there should be an informal fiduciary duty question.

Court: Overruled.

Defense counsel: To the extent that it is included we do require—we object to the extent there is no language to support or there isn't a definition given to [the] jury that the relationship must have existed prior to and separate from the transaction giving rise to the alleged breach of fiduciary duty.

Court: Overruled.

Defense counsel: And we would like to submit our proposed Question No. 8—actually, 8 should have been with regard to my last question. I apologize, Your Honor.

Court: Well, whatever.

Defense counsel: I'm guessing the last one should have been with regard to this. And, I'll go ahead and on the same basis we object to Question No. 9, 10, 11, 12 again on the basis there is no evidence of written formal

21

> fiduciary duty or relationship—confidential relationship of trust.

Court:                 Overruled, overruled, overruled, overruled.

The jury found that Smith and Saden had an agreement, which only Saden had breached.  It also found that Saden did not comply with his fiduciary duties.  The jury awarded damages in the following amounts: (1) $941,907 for breach of contract, (2) $393,093 for breach of fiduciary duty, and (3) $941,907 for Saden's profit from the conduct found to be a breach of his fiduciary duties.  Smith moved for entry of judgment on the verdict, for a turnover, and for permanent injunctive relief.

The trial court rendered judgment for (1) $941,907 for breach of contract, plus attorney's fees of $465,173.27 (and contingent appellate attorney's fees in the aggregate amount of $125,000) and prejudgment interest in the amount of $91,255.35; (2) $393,093 for breach of fiduciary duty, plus prejudgment interest in the amount of $38,090.24; and (3) $941,907 for equitable disgorgement of profits "found by the jury to have been obtained by [Saden] as a result of his acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity with respect to [Smith]," plus prejudgment interest in the amount of $91,255.35.  The judgment also characterized the assets in possession of the receiver as having been "received or obtained as a result of Defendant, Charles R. Saden's acts of fraud,

defalcation and embezzlement while acting and serving in a fiduciary capacity to Plaintiff, Brian Smith."

Saden raises four issues on appeal. In his first issue, Saden argues that Smith, in his individual capacity, lacked standing to pursue the claims pleaded against Saden for damages related to POS. Second, Saden contends that Smith should have been required to elect a remedy instead of recovering duplicative damages for lost profits. Third, Saden challenges Smith's recovery for breach of fiduciary duty because no question on the existence of a duty was submitted to the jury and because there was no preexisting special relationship sufficient to support a finding of an informal fiduciary duty. Finally, in his fourth issue Saden asks this court to reform the judgment to eliminate language not supported by any jury finding, specifically the judgment's reference to fraud, defalcation, and embezzlement.

### A. Smith's standing

Smith's original petition included causes of action for breach of contract and breach of fiduciary duty. Saden challenges Smith's standing as a 50% shareholder of POS to individually recover the company's lost profits pursuant to those claims. As noted above, standing is a component of subject matter jurisdiction, it cannot be waived, and it is never presumed. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 443–44; *Blue*, 34 S.W.3d at 553–54. Smith had standing to assert the causes of action

submitted to the jury if he raised "an actual, not merely a hypothetical or generalized grievance." *Brown*, 53 S.W.3d at 302.

Saden relies on *Wingate v. Hajdik*, 795 S.W.2d 717 (Tex. 1990), for the proposition that Smith cannot recover personally for damages incurred by a corporation of which he is a shareholder. In that case, the Supreme Court of Texas held that "[a] corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong." *Wingate*, 795 S.W.3d at 719. A shareholder may nevertheless recover damages "for wrongs done to him individually" when he pleads and proves that the defendant has violated a duty that he owed the shareholder, which arises from contract or otherwise. *Id.*

Saden filed special exceptions arguing that "the essence of Smith's allegations is to vindicate for wrongs allegedly done to POS, as opposed to wrongs directed at Smith individually." The trial court denied the special exceptions, and Smith later amended his petition, specifically pleading that he was alleging various causes of action—including breach of contract and breach of fiduciary duty—as both individual and derivative claims. Specifically, Smith alleged a claim for a personal breach of contract based on "contractual obligations, and Smith's contractual rights, under the several agreements signed by the parties; including without limitation, the articles of organization and the by-laws of POS." Smith

24

also alleged that Saden breached a fiduciary duty owed to him personally because of the circumstances surrounding the creation and operation of POS which allegedly created a confidential relationship between them.

At trial, there was evidence that Smith and Saden—the sole directors, officers, and shareholders of the corporation—agreed to split the revenues from POS equally. There was also evidence of the factual circumstances of the relationship between Saden and Smith prior to the formation of POS.

At the charge conference, Smith sought to include jury questions on his derivative claims and the court refused his requests. Saden does not challenge Smith's standing to bring a derivative claim, and the only apparent basis for the trial court's failure to separately submit questions on the derivative claims stems from the fact that POS was a closely held corporation. *See* TEX. BUS. ORGS. CODE ANN. § 21.563(a) (West 2012). If justice requires, a court may treat a derivative proceeding brought by a shareholder of a closely held corporation as if it were a direct action brought by the shareholder for the shareholder's own benefit. *Id*. § 21.563(c)(1). Smith met these criteria and therefore the trial court was authorized to act as it did, treating his derivative claim as a direct claim.

We hold that Smith had standing to assert his claims, whether individually or derivatively, and we overrule Saden's first issue.

25

**B.     Breach of fiduciary duty**

Saden argues that Smith cannot recover for breach of fiduciary duty because any duty was owed to the corporation, no duty question was submitted to the jury, and there was no pre-existing special relationship to support an informal fiduciary duty.

We again note the special circumstances applicable to a closely held corporation. Smith pleaded his claims both in his individual capacity and also derivatively on behalf of the closely held corporation. The evidence conclusively established that POS was a closely held corporation and that Smith was one of its two 50% shareholders. Accordingly, the trial court was authorized to treat the derivative claims as individual claims. *See id.* Moreover, "a recovery in a direct or derivative proceeding by a shareholder may be paid directly to the plaintiff or to the corporation if necessary to protect the interests of creditors or other shareholders of the corporation." *Id*. § 21.563(c)(2); *Swank v. Cunningham*, 258 S.W.3d 647, 665 (Tex. App.—Eastland 2008, pet. denied). Saden devotes his briefing on this issue to the lack of jury findings that a relationship of trust and confidence existed between Saden and Smith before the formation of POS. In his brief, Saden argues about Smith's failure to secure jury findings that there was "a *pre-existing* special or fiduciary relationship." He notes that the trial court denied his motion for directed verdict, in which he argued, "The evidence has shown they

26

had no relationship whatsoever before they met with regard to the POS venture." He also notes his objection to jury question no. 8 on the basis that there was no evidence of "a confidential relationship that predates the POS transaction."

Question No. 8 presupposed the existence of a fiduciary duty, and asked, "Did Charles Saden comply with his fiduciary duties to Brian Smith?" There is no question that as an officer of POS, Saden owed a fiduciary duty to the corporation as a matter of law. *See, e.g.*, *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963). Because POS was a close corporation and Smith was one of its shareholders, the trial court was authorized to allow Smith to pursue his derivative claim on behalf of POS as if it were his own. *See* TEX. BUS. ORGS. CODE ANN. § 21.563(c)(1) & (2). Smith does not contest that sufficient evidence supports the jury's answer to Question No. 8 regarding breach. Because Smith owed a fiduciary duty as a matter of law, the trial court did not err in submitting this claim to the jury. The jury's finding of a breach of fiduciary duty was supported by the evidence.

In an attempt to avoid the application of section 21.563(c), Saden primarily relies upon *Guerra v. Guerra*, No. 04-10-00271-CV, 2011 WL 3715051 (Tex. App.—San Antonio Aug. 24, 2011, no pet.) (mem. op.), for the proposition that Smith cannot use the provision to obtain an individual recovery. In *Guerra*, a minority shareholder in a family business asserted claims "on her own behalf . . .

27

based solely on her individual damages, not on any damage to the corporation." 2011 WL 3715051, at *5. In that circumstance, the court of appeals held that although section 5.14 of the Business Corporation Act (the predecessor to section 21.563) allowed a derivative claim to be "treated by a court as a direct action brought by the shareholder for the shareholder's own benefit," the provision nevertheless "does not allow a shareholder an individual claim." *Guerra*, 2011 WL 3715051, at *5. That reasoning does not apply to this case, in which Smith actually has alleged and demonstrated injury to the corporation, POS.

The other two cases referenced by Saden in this regard are also distinguishable. In *2055 Inc. v. McTague*, No. 05-08-01057-CV, 2009 WL 2506342 (Tex. App.—Dallas Aug. 18, 2009, no pet.), the defendants attempted to use a release signed by an individual to bar that individual's derivative claim asserted on behalf of a corporation of which she was a shareholder. The court of appeals declined to apply article 5.14 to treat the corporation's claims as ones "in reality" filed by the individual shareholder subject to a contractual release—a completely inapposite scenario. *2055 Inc.*, 2009 WL 2506342, at *8.

In *Swank v. Cunningham*, 258 S.W.3d 647 (Tex. App.—Eastland 2008, pet. denied), the court affirmed a summary judgment against two individuals who purported to assert derivative claims on behalf of a corporation on the ground that evidence had been presented sufficient to disprove that the individuals were

shareholders of the subject company, and the individuals failed to come forward with evidence to raise a fact issue as to whether they owned stock in the company. *Swank*, 258 S.W.3d at 662–64. In an alternative holding, the court suggested that even if the individual claimants had been shareholders, the trial court acted within its discretion by declining to allow them to pursue derivative claims in their individual capacities and for their own benefit because they only claimed to own 40% of the company and the record reflected "substantial and longstanding disputes" between them and the majority shareholder, which would have required that any recovery for the company would have to be paid to the company to protect the majority shareholder's interest. *Id*. at 664–66. The factual circumstances of Smith's pursuit of derivative claims on behalf of POS do not share the characteristics that led the *Swank* court to observe, in dicta, that the trial judge would have acted in his discretion to refuse to authorize individual shareholders to pursue derivative claims. *See* TEX. BUS. ORGS. CODE ANN. § 21.563(c)(1).

Because Saden and Smith are the only shareholders of POS, the injury suffered by the corporation is the injury suffered by Smith as 50% shareholder to the extent it inured to the other 50% shareholder's benefit. Considering that Smith was the only shareholder injured by Saden's wrongful conduct (while Saden himself, as the only other shareholder, benefited from it), the recovery could be paid to Smith directly to protect his interests.

29

We therefore overrule the challenge to the liability finding on the claim for breach of fiduciary duty.

### C. Election of remedies

Saden argues that the trial court erred in awarding Smith duplicative damages and that Smith was required to elect a remedy. Specifically Saden objects to the cumulative award of three separate measures of profits as actual damages for breach of contract, actual damages for breach of fiduciary duty, and for equitable disgorgement as a further remedy for breach of fiduciary duty. Saden raised this issue in a post-trial motion to modify, correct, or reform the judgment, which the trial court denied. In this context, we review the trial court's judgment for abuse of discretion. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *Wagner v. Edlund*, 229 S.W.3d 870, 879 (Tex. App.—Dallas 2007, pet. denied). A trial court abuses its discretion if it acts without reference to guiding rules and principles, or if it fails to follow such guiding rules and principles. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). "Another way of stating the test is whether the act was arbitrary or unreasonable." *Downer*, 701 S.W.2d at 242.

"A party is generally entitled to sue and to seek damages on alternative theories." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d

182, 184 (Tex. 1998); *see also Madison v. Williamson*, 241 S.W.3d 145, 158 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). "If a plaintiff pleads alternate theories of liability, a judgment awarding damages on each alternate theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory." *Madison*, 241 S.W.3d at 158 (citing *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987)). A corollary to this principle is the one-satisfaction rule: for one injury there can only be one recovery. *See, e.g.*, *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006); *see also Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991). When a defendant's acts result in a single injury, and the jury returns favorable findings on more than one theory of liability, the plaintiff is entitled to judgment on the theory affording him the greatest relief. *See Birchfield*, 747 S.W.2d at 367; *Madison*, 241 S.W.3d at 158–59.

In order to answer the question of whether an election of remedies was required in this case, it is therefore necessary to carefully review the record to determine whether the claimant supported alternate theories of liability with evidence indicating separate and distinct injuries resulting in separate and distinct damages. In this case, the jury was asked to quantify "profits" in three different questions: in question no. 4 (breach of contract lost-profits damages), in question

no. 10 (breach of fiduciary duty lost-profits damages), and in question no. 11 (equitable disgorgement of profits). Questions 4 and 10 specifically instructed the jury to award only "lost profits," if any, defined in each case as the "natural, probable, and foreseeable consequence" of Saden's failure to comply with his contractual or fiduciary duty. While "[r]ecovery for lost profits does not require that the loss be susceptible of exact calculation," the amount of lost profits "must be shown by competent evidence with reasonable certainty." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.*; *see also Natural Gas Pipeline Co. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012) ("a business owner's conclusory or speculative testimony of lost profits will not support a judgment").

At trial, Smith testified about various acts of self-dealing that Saden committed, such as selling POS accounts and keeping some of the money for himself in the Precision account. There were many questions about the sums of money generated as a result of POS business and whether the money was deposited in the POS account or a Precision account, whether the money was split evenly, and whether Saden used the money for his personal use. There were also questions about expenses and what or whether POS expenses were paid by money kept in the Precision account. And Smith was asked about the nature of the injury that he

32

suffered as a result of the actions alleged in this lawsuit. Smith said, "I as a shareholder, owner of POS Card Processing was deprived of any income that I should have received out of the profits that were earned by POS Card Processing, so the company was damaged, and I was damaged." Smith testified that "the reduction of the value to POS" was "was the primary reason" he was "damaged individually."

To prove his damages at trial, Smith presented the testimony of Bill Shields, an accountant who analyzed the records of POS and Precision. Shields relied on certain assumptions in determining the amount of money Saden owed Smith. Basing his analysis on Smith's version of events, he assumed that the men agreed to share the company's revenue equally but did not agree to all of the expenses incurred by Saden and charged to POS. Thus, Shields did not consider as reasonable and necessary business expenses the money that Saden spent on salaries for him and his relatives or the expenses that otherwise personally benefited Saden (such as traveling and meals). Shields included as part of the revenue that should have accrued to POS under the agreement $2.41 million that was diverted from POS to Precision. He testified that based on his analysis, Saden owed Smith "solely" $941,907, explaining that this amount "represents the excess portion of the income that was either received by or directed to the benefit of Saden."

As was the case in *Madison v. Williamson*, 241 S.W.3d 145 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), Smith made no attempt in the trial court to distinguish between the damages he suffered as a result of Saden's breach of contract and his breach of fiduciary duty. Instead, Smith presented a unified damages model through the testimony of Shields, who explained that he included the elements of self-dealing that were apparent from the accounting records in determining the distributions that Smith should have received from POS. There was no attempt to segregate damages attributable to breach of the parties' agreement from any other damages that somehow may have been attributable to separate disloyal acts in breach of Smith's fiduciary duty. Moreover, the evidence at trial did not clearly show two separate injuries in this regard. Rather, it showed generally that Saden diverted revenue to himself and failed to evenly divide what revenue was actually received by POS. The expert testimony indicated that Smith's share of the POS proceeds, which Shields calculated to be $941,907, was effectively the same as the profit Saden wrongfully obtained by breaching his fiduciary duty.

In his appellate brief, Smith contends that the separate awards for breach of contract and breach of fiduciary duty are supported by the record, arguing:

> The contract damages were limited to that portion of the fifty percent (50%) of the business profits that were not paid to Smith by Saden, whereas the fiduciary breach damages were, *inter alia*, caused by Smith's [a] failure to secure the best price possible for the POS

34

accounts that he secretly sold; [b] failure to secure commission rates for POS equal to those he secured for himself; [c] sale of POS accounts and equipment; [d] theft of $200,000 in certificates of deposit; [e] use of POS funds to pay personal living expenses for himself and his family; [f] theft of POS funds *after* the appointment of the Receiver; and [g] enriching himself through a series of self-dealing transactions. The damages caused by Saden's breach of his fiduciary duty were different from, and not part of, the contract damages because they were of a nature that they did not cause an unequal division of the profits from the business.

Appellant's Brief at 27–28 (footnotes omitted); *see also* Dissent at 7.

We disagree. First, there is significant overlap between this litany of Saden's misdeeds and the misconduct documented and accounted for in the Shields damages model, which represented "the excess portion of the income that was either received by or directed to the benefit of Saden." For example, Shields's calculations expressly accounted for acts of corporate waste, most significantly including the "use of POS funds to pay personal living expenses for himself and his family" in that his analysis did not treat those expenses as reasonable and necessary corporate expenses, but instead treated $1,379,369 of expenses paid by POS as "Distributions to/for the benefit of C. Saden." Likewise, to the extent that Smith's reference to "enriching himself through a series of self-dealing transactions" is also a reference to the payment of Saden's living expenses with

35

POS funds, as strongly suggested by a footnote in Smith's brief,[1] that category also is incorporated into the Shields damages model. Finally in this regard, Smith's reference to the "theft of $200,000 in certificates of deposit" is not further supported or explained with any citation to the record, but it apparently refers to a CD that Saden testified that he purchased from the Precision account with funds

---

[1] In Smith's appellee's brief, the reference to Saden "enriching himself through a series of self-dealing transactions" is followed by a footnote, which reads:

> In fact, Shields, the accounting expert, allowed for $1,600,000 in expenses in computing the contract damages, even though many of those payments were to or for self-dealing transactions for the benefit of Saden and his family (e.g., meals, insurance and utilities including, gas, water, electricity and other expenses). *See* PX 301. Although those payments are not included in Smith's contract damages, but they are tort damages in Smith's breach of fiduciary duty claim, and they far exceed the $393,093.00 found by the jury. *Kinzbach Tool Co. v Corbett-Wallace Corp.*, S.W.2d 509, 512–14 (Tex. 1942).

Appellee's Brief at 28 n.42. Though the source of the $1,600,000 figure is unexplained, to the extent Smith argues that the Shields model did not include payments "for the benefit of Saden and his family (e.g., meals, insurance and utilities including, gas, water, electricity and other expenses)," he plainly misstates the record. The examination and cross-examination of Shields made quite clear that between POS and Precision, Shields determined that Saden "paid himself through either salary, commissions, benefits, personal expenses, home expense, whatever it may be, $2,740,927." Of this amount, the only expenses that Shields treated as legitimate business expenses were commissions and director fees. The Shields damages model accounts for payments made for the benefit of Saden and his family, and it compensates Smith for his injury to the extent the revenues of POS and Precision were not evenly split between him and Saden as a result of such payments.

36

that were obtained from the sale of POS accounts. The Shields analysis includes $1,188,846 of distributions from Precision for the benefit of Saden, and while the record evidence does not include detailed individual transactions supporting that figure, it does show total amounts of distributions broken down by year in amounts ranging from $65,061 in 2004 to $397,995 in 2007. There is no evidence to suggest that Saden's purchase of a $200,000 certificate of deposit from Precision funds for his own benefit is not included in Shields's calculation of $1,188,846 of distributions to Saden from Precision.

Second, the record reveals no competent evidence from which a fact finder could determine with reasonable certainty the amount of lost profits separately attributable only to breach of contract or only to breach of fiduciary duty. *See Holt Atherton*, 835 S.W.2d at 84. The only element of damages listed in questions 4 and 10 was "lost profits." The charge instructed the jury to consider that element of damages, "if any, and none other." Neither party objected to the lost-profits language in the charge, and neither party requested a different or additional measure of damages be submitted to the jury.

The jury awarded the full measure of lost profits supported by the accountant's testimony as contract damages: $941,907. It may have been possible to categorize Saden's various bad acts between breaches of contract and other separate breaches of fiduciary duty, and then to quantify lost profits or other

37

damages attributable to each so as to identify separate injuries leading to separate amounts of damages. But as this case was presented, tried, and charged to the jury, the actual evidence of injury and lost profits did not show separate and distinct injuries resulting in separate and distinct lost profits. *See Madison*, 241 S.W.3d at 158. Smith's damages model showed that he suffered one injury: he was deprived of all the money he was due from POS because of the various faithless actions taken in violation of the parties' agreement and Saden's fiduciary duties.

To the extent Smith suggests that other lost profits may have been attributable to other bad acts not addressed by the Shields analysis, his brief has pointed us to no such evidence in the record, and our own review has found none. Smith's brief points to no evidence of any value—much less a valuation that would satisfy *Holt Atherton*—assigned to the lost profits attributable to Saden's "failure to secure the best price possible for the POS accounts that he secretly sold," "failure to secure commission rates for POS equal to those he secured for himself," "sale of POS accounts and equipment" (other than the purchase of the $200,000 certificate of deposit apparently included in Shields's calculation of distributions from Precision to Saden), or "theft of POS funds *after* the appointment of the Receiver." *See* Appellee's Brief at 28.

In sum, Smith demonstrated his entitlement to a unified recovery for one broadly described injury with one damages model sponsored by accountant

38

Shields. *See id.* Accordingly, Smith failed to justify separate awards for alternate theories of liability, as the theories as presented at trial did not depend on separate and distinct injuries resulting in separate and distinct damages. *See Madison*, 241 S.W.3d at 158. Under such circumstances, allowing the recovery of actual damages for both breach of contract and breach of fiduciary duty violates the one-satisfaction rule, and is therefore error. *See, e.g.*, *Downer*, 701 S.W.2d at 241–42.

We reach a different conclusion with respect to the award of equitable disgorgement of profits. Question no. 11, the basis for the equitable forfeiture award, was predicated on the liability question for breach of fiduciary duty, and it was phrased in terms of the "profit" Saden obtained by his tortious conduct. Nevertheless, equitable forfeiture is distinguishable from an award of actual damages, in that it serves a separate function of protecting fiduciary relationships. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 874 (Tex. 2010). Even if a fiduciary does not obtain a benefit by violating his duty, he still may be required to forfeit the right to compensation for his work. *Id*. at 873 (citing *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999)). Saden did not present any legal challenge to the amount of the equitable disgorgement award, so we express no opinion about the measure of the equitable remedy awarded. Instead, Saden only challenges the award on the basis that it is duplicative of the other awards of damages, in violation of the one-satisfaction rule. We hold that the one-satisfaction rule does

not preclude the recovery of both actual damages and the equitable remedy of disgorgement of profits, as these remedies are intended to address separate and distinct injuries.  *Cf. ERI Consulting*, 318 S.W.3d at 882 (remanding case for further proceedings on both equitable disgorgement and lost-profits awards).

We sustain Saden's issue in part and hold that on the facts of this case, the trial court erred in rendering judgment that permitted duplicative recovery of actual lost-profit damages for both breach of contract and breach of fiduciary duty.  We overrule Saden's issue to the extent that he argues that the one-satisfaction rule disallows an award of both actual damages and the equitable remedy of disgorgement of profits.  Ordinarily we would reform the judgment to effect an election of the remedy that affords the prevailing party the greatest relief.  *See, e.g.*, *Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 423 (Tex. App.—Houston [1st Dist.] 1994), *writ denied*, 907 S.W.2d 452 (Tex. 1995) (per curiam).  However, this case is complicated by the fact of Saden's bankruptcy and the bankruptcy court's order of non-dischargeability.  Because it is not readily apparent from the appellate record which theory of liability Smith would elect, we will remand to permit Smith to make an election.

### D.    Findings of fraud, defalcation, embezzlement

In his fourth issue, Saden argues that the court erred by including recovery and findings on issues that were not submitted to the jury or conclusively

40

established. Specifically, Saden objects to the inclusion of language stating that he committed "acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity." Saden also specifically objects to the following language on page 4 of the trial court's judgment:

> The Court finds that all of the business and assets that are currently in the Receiver's possession, custody and control belong to POS, that any such assets that are currently in the Receiver's possession, custody and control belong to POS, that any such assets received or obtained by, or in the name of Defendants Charles R. Saden or Precision Payments Company were received or obtained as a result of Defendant, Charles R. Saden's acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity to Plaintiff, Brian Smith.

Saden's complaint appears to be two-fold, that: (1) the court erred by including in the judgment findings of "fraud, defalcation, and embezzlement" that were not submitted to the jury and that Smith relied upon in the bankruptcy court to argue for an order of non-dischargeability of the debt, and (2) the court erred by making a determination regarding the assets that were then in the Receiver's possession.

An issue must be submitted to the jury when it is (1) raised by the pleadings and the evidence, (2) disputed, and (3) properly requested. *See Cianfichi v. White House Motor Hotel*, 921 S.W.2d 441, 443 (Tex. App.—Houston [1st Dist.] 1996, writ denied); *see also T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex. 1992). Texas Rule of Civil Procedure 279 provides, "Upon appeal all independent grounds of recovery or of defense not conclusively established

41

under the evidence and no element of which is submitted or requested are waived."

TEX. R. CIV. P. 279.

Common-law fraud includes both actual and constructive fraud. *Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 702 (Tex. App.—Fort Worth 2006, pet. denied). "A plaintiff seeking to prevail on claim of actual fraud must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011). However, constructive fraud is "the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964). "Evidence supporting a breach of fiduciary duty may, in appropriate circumstances, support a constructive-fraud finding." *Murphy v. Am. Rice, Inc.*, No. 01-03-01357-CV, 2007 WL 766016, at *10 (Tex. App.—Houston [1st Dist.] Mar. 9, 2007, no pet.); *accord Flanary v. Mills*, 150 S.W.3d 785, 795 (Tex. App.—Austin 2004, pet. denied).

42

The Fifth Circuit has defined defalcation, as relevant to the context of a discharge in bankruptcy, as a "willful neglect of fiduciary duty," which need not be accompanied by fraud or embezzlement. *In re Schwager*, 121 F.3d 177, 184–85 (5th Cir. 1997); *see also Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1758–59 (2013) (in the course of holding that "defalcation" as used in 11 U.S.C. § 523(a)(4) requires an intentional wrong, generally observing broad disagreement among legal authorities about the meaning of "defalcation"); *Balusik v. Kollatschny*, No. 01-99-01342-CV, 2002 WL 1822360, at *4 (Tex. App.—Houston [1st Dist.] Aug. 2, 2002, no pet.) (not designated for publication) ("Defalcation is also defined as '[l]oosely, the failure to meet an obligation; a nonfraudulent default.'").

Embezzlement requires proof that (1) the defendant was the agent of the person or corporation alleged to have been harmed and was charged with the duty of receiving money of his principal, (2) he received money belonging to his principal in the course of his employment, and (3) that he embezzled, misapplied, or converted it to his own use. *Fellers v. State*, 138 Tex. Crim. 307, 308, 136 S.W.2d 217, 218 (Tex. Crim. App. 1940); *see* TEX. PENAL CODE ANN. § 32.45 (West 2011) (misapplication of fiduciary property or property of financial institution).

Smith did not raise in his pleadings the issues of whether Saden committed acts of fraud, defalcation, and embezzlement. Nor did he request a jury question on these issues. Comparing the elements of fraud, defalcation, and embezzlement to the jury charge, we conclude that not all of the elements of fraud, defalcation, and embezzlement were submitted to the jury. Accordingly, we hold that the trial court erred by including this language in the judgment, and we sustain this issue in part.

Finally, we consider Saden's challenge regarding the portion of the judgment concerning the assets in the receiver's possession. The court appointed a receiver in February 2009, and the receiver took possession of POS along with the entities Saden created and used to divert POS revenues. Section 11.403 of the Business Organizations Code provides: "The court appointing a receiver under this section has and shall retain exclusive jurisdiction over the specific property placed in receivership. The court shall determine the rights of the parties in the property or its proceeds." TEX. BUS. ORGS. CODE ANN. § 11.403(c) (West 2012). Here, the judgment noted that the trial court lacked authority to dispose of the property held by the receiver due to the automatic bankruptcy stay and ordered the future delivery of the assets held by the receiver to the bankruptcy trustee.

Saden argues, without citation to authority, that "[t]he jury did not make any findings about POS assets, nor was it asked anything about Precision Payment

44

Company or Hohen-Saden, LLC. The jury was asked about damages, not these issues of ownership or entitlement, and to make any such award or finding here would also be a duplicative recovery." But this particular aspect of the final judgment does not award a duplicative recovery: it defers determination of the ownership of the assets held by the receiver to the bankruptcy court. We hold that the court did not err in doing so.

## Conclusion

We reverse the trial court's judgment to the extent that it permitted duplicative recovery of damages for breach of contract and breach of fiduciary duty and included additional unauthorized findings that Saden committed acts of "fraud," "defalcation," and "embezzlement," and we remand to the trial court to allow Smith to elect a remedy and for entry of a new judgment, which does not include language purporting to make findings based on fraud, defalcation, or embezzlement.

                                    Michael Massengale
                                    Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Justice Jennings, dissenting.