**Opinion issued August 19, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-13-00147-CV

————————————————

**JENIFFER ALOYSIUS, Appellant**

**V.**

**MARK KISLINGBURY, Appellee**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-23683**

---

## MEMORANDUM OPINION

Appellant, Jeniffer Aloysius, challenges the trial court's judgment, entered after a trial to the court, in favor of appellee, Mark Kislingbury, in his suit against her for breach of contract, fraud, conversion, and breach of fiduciary duties. In

four issues, Aloysius contends that Kislingbury lacks standing to recover in his individual capacity, the evidence is legally and factually insufficient to support the amount of damages awarded, and the trial court erred in awarding Kislingbury appellate attorney's fees.

We affirm the judgment of the trial court as modified.

## Background

In his third amended petition, Kislingbury alleged that he and Aloysius organized StenoMaster, Inc. ("Stenomaster"), a Colorado corporation, on October 5, 2004. He and Aloysius were the directors and shareholders, with Kislingbury owning 75 percent of the issued stock and Aloysius owning 25 percent. In his individual capacity, Kislingbury sued Aloysius for breach of contract, fraud, conversion, and misappropriation, alleging that she had "directly and uniquely injured" him by "maliciously suppress[ing] the payment . . . of monies to which he was entitled." As a shareholder, derivatively on behalf of StenoMaster, Kislingbury sued Aloysius for fraud, breach of fiduciary duty, and negligent management. He asserted that StenoMaster is a closely held corporation and he had "not sought to have this suit brought for [StenoMaster] nor made a demand for accounting by the Board of Directors of [StenoMaster], since any effort would be futile in that [Aloysius] is an alleged director . . . [and] would not have taken action against herself." Aloysius answered with a general denial, asserted various

2

affirmative defenses, and included a verified denial that Kislingbury had capacity to sue in Texas.

At trial, Kislingbury testified that he has been a court reporter for thirty years and is engaged in the business of training other court reporters and providing educational materials through various companies he owns. He met Aloysius, who is also a court reporter, when he spoke at a convention, and she later asked him to speak at a convention in Colorado, where she lives. Shortly thereafter, they decided to form StenoMaster to allow Kislingbury to focus on conducting his educational seminars and selling court-reporting training materials, while Aloysius marketed his products and performed the administrative duties.

In February 2004, Kislingbury and Aloysius executed an agreement (the "Agreement") to form StenoMaster. Although Kislingbury was a Texas resident, they filed their articles of incorporation in Colorado, where Aloysius resided. They appointed Kislingbury as president and chief executive officer, with Aloysius serving as vice-president. The Agreement provides that StenoMaster's revenues, liabilities, and "management and operating expenses" were to be apportioned in accordance with the ownership ratio, i.e., 75 percent to 25 percent. Further, in regard to "management and operating expenses," the parties agreed

> to consult with each other prior to committing Corporate funds or extending Corporate liability and [to] do so only upon mutual agreement. Neither party is precluded from contributing to the Corporation without the expectation of remuneration or

reimbursement and freely waives the right to recover such remuneration or reimbursement.

The Agreement further provides that intellectual property rights were to "remain the exclusive property of the originator of the product concept or service." It is undisputed that, in 2005, the parties agreed to modify the apportionment of revenues, liabilities, and expenses to 70 percent owing to Kislingbury and 30 percent to Aloysius.

Kislingbury explained that in 2007, the parties' relationship began to deteriorate. He sought to buy Aloysius's interest in StenoMaster and retained a business valuator, but Aloysius refused to provide an accounting. Upon discovering that she had written numerous checks from the StenoMaster account to herself and to CourtReps, Inc. ("CourtReps"), an independent company that she owned, Kislingbury brought the instant suit.

Kislingbury further testified that Aloysius had made "improper" payments to herself, totaling $158,241.74, and to CourtReps, totaling $184,868.69. The payments included "reimbursements" of $11,000 for "office supplies," $15,000 for seminar expenses, $28,000 for "office administration," $45,000 for "communications," and $101,000 for "tech support." In regard to Aloysius's claimed "reimbursements," Kislingbury had "never seen any checks from CourtReps or [Aloysius] paying any of the people she claim[ed] to have paid." He also noted that Aloysius, without his consent, had made numerous regular

4

payments to herself and to CourtReps for "teaching" and "consulting." And he sought to recover "his part of the funds" that Aloysius "had diverted." In December 2007, when Kislingbury stopped payment on two checks totaling $15,000 that Aloysius had written to herself, she "shut down" the StenoMaster website and redirected its students to CourtReps. Kislingbury explained that this action "essentially shut down StenoMaster."

Aloysius testified that she maintained the bookkeeping for StenoMaster, wrote checks from the StenoMaster checking account, and had a StenoMaster credit card for expenses. She explained that neither she nor Kislingbury had made opening capital contributions and, during its operating period, from January 2004 until August 2008, StenoMaster "was not profitable." Specifically, the total income during that period was $849,245, and total expenses were $915,282. She explained that because "StenoMaster consistently didn't have the funds," she would pay its expenses from her personal accounts and "reimburse herself when funds became available" in the StenoMaster account.

After trial, Kislingbury moved for entry of judgment "in favor of Plaintiff, Mark Kislingbury." Without stating the grounds on which he prevailed, the trial court rendered judgment for Kislingbury against Aloysius for damages in the amount of $240,177.30, trial attorney's fees of $98,000, and appellate attorney's fees in the event of appeal. The trial court noted that its judgment was final and all

other relief was denied. Although the trial court did not issue findings of fact and conclusions of law, the record does not show that Aloysius filed the requisite notice of past due findings.[1] And her motion for new trial was overruled by operation of law.

## Standing

In her first issue, Aloysius argues that the trial court erred in awarding damages to Kislingbury individually because "StenoMaster is the only party that can recover for [her] alleged misappropriation of the corporation's assets." She further argues that because Kislingbury "claim[s] that [she] improperly paid herself" from StenoMaster's checking account and "misappropriated" StenoMaster's assets, "[t]he damages belong to StenoMaster—not Kislingbury personally."

A challenge to a plaintiff's right to seek individual redress based on allegations of wrongs done to a corporation implicates standing. *See Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990); *see also Saden v. Smith*, 415 S.W.3d 450, 462–63 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Standing is implicit in the concept of subject-matter jurisdiction, and subject-matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Thus, standing is

---

[1] *See* TEX. R. CIV. P. 297; *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 410 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

6

never presumed and cannot be waived. *Id*. at 443–44. We review standing under the same standard by which we review subject-matter jurisdiction generally. *Id*. at 446. Whether a trial court has subject-matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004).

The test for standing requires that there be a real controversy between the parties that will actually be determined by the judicial declaration sought. *See Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996). Without a breach of a legal right belonging to the plaintiff, no cause of action can accrue to his benefit. *See Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976).

Generally, "[a] corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong." *Wingate*, 795 S.W.2d at 719. However, "[t]his rule does not . . . prohibit a stockholder from recovering damages for wrongs done to him individually where the wrongdoer violates a duty arising from contract or otherwise, and owing directly by him to the stockholder." *Id.*; *see Faour v. Faour*, 789 S.W.2d 620, 622 (Tex. App.—Texarkana 1990, writ denied) (explaining that principle is "a recognition that a shareholder may sue for violation of his individual rights, regardless of whether the corporation also has a cause of action"). "[T]o recover

7

individually, a stockholder must prove a personal cause of action and personal injury." *Wingate*, 795 S.W.2d at 719.

In *Saden*, the plaintiff and defendant were the sole shareholders of a closely held corporation that they formed under an agreement to "share equally in the revenues" of the company. 415 S.W.3d at 457. The plaintiff, in his individual capacity and in a derivative capacity as a shareholder of the company, sued the defendant for breach of contract and breach of fiduciary duty, alleging that the defendant had diverted company revenues to his personal account and withheld information regarding the financial status of the company. *Id.* at 457–59. We explained that the plaintiff had alleged "a claim for a personal breach of contract based on 'contractual obligations,' and [the plaintiff's] contractual rights under the several agreements signed by the parties" in forming the company. *Id.* at 463. We concluded, in part, that the plaintiff had standing to assert his claims individually. *Id.*

Here, like the parties in *Saden*, Kislingbury and Aloysius are the sole shareholders of a closely held corporation that they formed under an agreement to share in its revenues. *See id.* at 457. Kislingbury brought a breach-of-contract claim in his individual capacity based on the Agreement to form StenoMaster that he and Aloysius had executed in their individual capacities. *See id.* at 459. Kislingbury alleged that Aloysius had "breached the terms of the Agreement" by

8

diverting StenoMaster revenues to her personal accounts, failing to make distributions in accordance with the apportionment stated in the Agreement, and withholding complete information regarding the financial status of the company. *See id.* at 457–58. And Kislingbury alleged that he was "injured individually by the . . . monetary benefits" that Aloysius received to his exclusion.

We hold that Kislingbury has standing to recover on his breach-of-contract claim in his individual capacity. *See Wingate*, 795 S.W.2d at 719 (stating that stockholder may recover "damages for wrongs done to him individually 'where the wrongdoer violates a duty arising from contract'"); *Saden*, 415 S.W.3d at 463.

We overrule Aloysius's first issue.

### Sufficiency of the Evidence to Support Damages

In her second issue, Aloysius argues that the trial court erred in awarding damages to Kislingbury because the evidence is legally and factually insufficient to support the amount of damages awarded.

In a nonjury trial, when no findings of fact or conclusions of law are filed, as here, we imply that the trial court made all necessary findings to support its judgment. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). When a reporter's record is filed, as here, the implied findings are not conclusive, and a party may challenge both the legal and factual sufficiency of the evidence supporting those findings. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d

9

789, 795 (Tex. 2002). The applicable standards of review are the same as those applied to review jury findings. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989). The trial court's judgment must be affirmed if it can be upheld on any legal theory finding support in the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.). We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id*. at 822. The term "inference" means,

> [i]n the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a

10

logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (quoting BLACK'S LAW DICTIONARY 700 (5th ed. 1979)). For a factfinder to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id*.

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then factfinders must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822.

In conducting a factual-sufficiency review, we must consider, weigh, and examine all of the evidence that supports or contradicts the factfinder's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001);

11

*Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989).  In a bench trial, the trial court is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary.  *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Zenner v. Lone Star Striping & Paving L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).  We may set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust.  *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

Here, the trial court did not, in its judgment, state the grounds on which Kislingbury prevailed.  Thus, its judgment must be affirmed if it can be upheld on any legal theory finding support in the evidence.  *Worford*, 801 S.W.2d at 109.

The elements of a breach of contract claim are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff.  *Northern & Western Ins. Co. v. Sentinel Inv. Grp., LLC*, 419 S.W.3d 534, 539 (Tex. App.—Houston [1st Dist.] 2013, no pet.).  Aloysius does not contend that the Agreement is not a valid contract, that Kislingbury did not perform under the Agreement, or that she not breach the Agreement.  *See id.*  Rather, Aloysius challenges the

12

sufficiency of the evidence to support the amount of damages awarded to Kislingbury.

"[I]n a breach-of-contract case, the normal measure of damages is just compensation for the loss or damage actually sustained, commonly referred to as the benefit of the bargain." *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Here, the Agreement provides that the parties agreed to divide StenoMaster's revenues, liabilities, and expenses by the "ownership ratio" of 75 percent to Kislingbury and 25 percent to Aloysius. It is undisputed that the parties later agreed to adjust the ratio to 70 percent to Kislingbury and 30 percent to Aloysius. And in regard to "management and operating expenses," the parties agreed "to consult with each other prior to committing Corporate funds or extending Corporate liability and [to] do so only upon mutual agreement."

Kislingbury testified that Aloysius made "improper payments" in the form of unauthorized fees and "reimbursements" to herself that totaled $158,241.74 and to CourtReps that totaled $184,868.69, the sum of which is $343,110.43. He explained that he was entitled to 70 percent of this sum, or $240,177.30, as the amount of the diverted funds that should have been distributed to him under the Agreement. And the trial court awarded Kislingbury damages in this amount.

Aloysius asserts that "Kislingbury's damage model is based solely on the money that [she] paid to herself and CourtReps" and "fails to take into account . . . expenses and liabilities." She argues that because the Agreement requires the parties to divide revenues, liabilities, and expenses, the proper measure of damages is a lost-profits model.

A benefit-of-the-bargain measure of damages may include reasonably certain lost profits. *Id.* "Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost-business activity, less expenses that would have been attributable to that activity." *Id.* (citing *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002)). A claimant must demonstrate one complete calculation of lost profits. *Holt Atherton*, 835 S.W.2d at 85. And the calculation of lost-profits damages must be based on net profits, not gross revenue or gross profits. *Id.* at 83 n.1. The amount of the loss need not "be susceptible of exact calculation" but must be shown by competent evidence with reasonable certainty. *Id.* at 84.

The trial court admitted into evidence a profit and loss summary reflecting that the total income for StenoMaster from January 2004 to August 2008 was $849,245, and its total expenses were $915,282. Kislingbury testified that Aloysius made payments to herself that totaled $158,241.74 and to CourtReps that totaled $184,868.69, the sum of which is $343,110. Aloysius admits that she made

14

payments to herself and her company, but she asserts that she did so in reimbursement for expenses that she had paid from her own accounts. And the trial court admitted into evidence Aloysius's spreadsheet on which she asserts that she paid expenses of $139,382 from her personal accounts and $195,529 from CourtReps's account, the sum of which is $334,911. Thus, the amount of the damages Kislingbury alleged, and the trial court awarded, is reasonably supported by Aloysius's own evidence. *See id.* And if the over $300,000 in challenged payments are subtracted from the total expenses shown on the profit-and-loss summary, StenoMaster would have been a profitable company.

Further, the trial court admitted into evidence numerous cancelled checks revealing over $100,000 in disbursements that Aloysius made to herself and CourtReps, including monthly distributions ranging from $2,500 to $10,000 for "teaching," "consultant," and "tech support" fees.

The parties disputed in the trial court whether there were *any* legitimate expenses attributable to the sums that Aloysius paid to herself and to CourtReps. Aloysius asserts that all of her payments to herself constituted reimbursements for expenses, which Kislingbury's damages model failed to take into account. Kislingbury asserts that all of the "reimbursements" that Aloysius claimed as expenses constituted "improper payments" of income to herself. And the Agreement required the parties "to consult with each other prior to committing

Corporate funds or extending Corporate liability and [to] do so only upon mutual agreement." Kislingbury testified that he had never agreed to pay Aloysius teaching, consulting, or tech support fees. And he asserted that Aloysius failed to provide "any documentation . . . to support her reimbursement claims, either during discovery or at trial." He asserted that he had "never seen any checks from CourtReps or [Aloysius]" demonstrating that she had paid "any of the people she claims to have paid." And Aloysius does not direct us to any place in the record showing any checks, credit card receipts, or statements from any of her personal accounts or account of CourtReps.

As the sole judge of the witnesses' credibility, the trial court could have chosen to believe Kislingbury over Aloysius. *See Golden Eagle Archery*, 116 S.W.3d at 761. And the trial court could have reasonably concluded that the total amount of damages asserted represented income that was directed to the benefit of Aloysius. *See Saden*, 415 S.W.3d at 466–67.

Considering the evidence in the light most favorable to the verdict, and indulging every reasonable inference that would support it, we conclude that there is more than a scintilla of evidence to support the trial court's damages finding. *Formosa Plastics*, 960 S.W.2d at 48. Viewing the evidence neutrally, we further conclude that the evidence is not so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust.

16

*See Pool*, 715 S.W.2d at 635. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Kislingbury sustained $240,177.30 in damages on his breach-of-contract claim.

We overrule Aloysius's second issue.[2]

## Appellate Attorney's Fees

In her fourth issue, Aloysius argues that the trial court erred in awarding appellate attorney's fees to Kislingbury because it did not make the award contingent on Aloysius's appeal being unsuccessful.

The trial court's judgment reflects that it ordered that Kislingbury recover from Aloysius $20,000 in attorney's fees "in the event there is an appeal to the Court of Appeals" and $5,000 "in the event there is an appeal to the Texas Supreme Court." An award of appellate attorney's fees to an appellee must be made conditioned upon the appellant's appeal being unsuccessful. *Hoefker v. Elgohary*, 248 S.W.3d 326, 332 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Kislingbury concedes that the award of attorney's fees to the Texas Supreme Court should be modified to be made conditional on the appeal being unsuccessful.

---

[2] Having held that Kislingbury has standing to recover on his breach-of-contract claim and the evidence is legally and factually sufficient to support the trial court's damages award, we need not reach Aloysius's third issue, in which she argues that StenoMaster cannot recover against her "because it did not appeal the take-nothing judgment against it."

17

We conclude that the trial court's judgment should be modified to make Kislingbury's award of attorney's fees for any appeal by Aloysius to the Texas Supreme Court conditional on her appeal being unsuccessful. Having overruled Aloysius's issues in the instant appeal, the contingency of the award of attorney's fees concerning her appeal to this court is moot.

Accordingly, we sustain Aloysius's fourth issue, in part.

## Conclusion

We modify the trial court's judgment to make the award of attorney's fees to Kislingbury for an appeal by Aloysius to the Texas Supreme Court contingent upon her appeal being unsuccessful.

We affirm the judgment of the trial court as modified.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.