**AFFIRM; Opinion Filed February 27, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00043-CV

**ALMA LOGAN AND LOGAN REAL ESTATE ASSOCIATES, LLC,**
**Appellants/Cross-Appellees**
**V.**
**RAYNETTE RANDALL, AS EXECUTOR OF THE ESTATE OF RAY ELLIS,**
**Appellee/Cross-Appellant**

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-12590**

## MEMORANDUM OPINION
Before Justices Pedersen, III, Reichek, and Carlyle
Opinion by Justice Reichek

Alma Logan and Logan Real Estate Associates, LLC appeal the trial court's judgment awarding Raynette Randall, as executor of the estate of Ray Ellis (the "Estate"), $135,000 in damages for breach of contract. Bringing three issues with multiple subpoints, Logan essentially challenges the sufficiency of the evidence to support the trial court's judgment. In a single cross-issue, the Estate contends the trial court erred in denying recovery on its claim for breach of fiduciary duty. We affirm the trial court's judgment.

## Factual Background

This case arises out of an oral agreement between Alma Logan and Ray Ellis. The facts testified to at trial are as follows.

Ellis was the founder and president of Kwik Industries which, among other things, developed and licensed Kwik Kar automotive oil change and lube shops. Ellis was also a licensed real estate agent who facilitated the sale of existing Kwik Kar shops to new owners. According to Logan, Ellis operated as a real estate agent under the auspices of her real estate brokerage.

Logan testified she was a self-employed, licensed real estate broker with Logan Real Estate Associates, LLC., doing business as RE/MAX Real Estate Associates. Over fifteen years before Ellis died, Logan and Ellis entered into an oral agreement, the undisputed terms of which were that, in exchange for working under Logan's real estate brokerage, Ellis would pay Logan a monthly "desk fee," a fee for E&O insurance, and a percentage of the commissions earned on his real estate transactions. Logan stated that, at the time of Ellis's death, the agreement was that she would receive 1% of the broker's fee commission up to $2,000.

In early 2015, Kelly Privett contacted Ellis and told him he was thinking of selling his Kwik Kar shop located on Inwood Road in Dallas. Privett and Ellis discussed pricing and Privett stated he agreed to pay a $150,000 broker's fee commission with the understanding that the money would go to Ellis. Privett had previously done about five other transactions with Ellis and he stated that Ellis always received the commission. Ellis told Privett he had a couple of potential buyers for the store.

In March 2015, Ellis and Privett signed a "Registration Agreement between Broker and Owner" listing "Munawar A. Piracha and/or Assigns" as the prospective buyer. The agreement further listed Privett's company, K&M Privett, Inc., as the owner of the property and "RE/MAX the Real Estate Associates" as the broker. Ellis's name was listed off to the side of the broker section. According to Logan, the agent usually signed the registration agreement on behalf of the sponsoring broker and, in this case, Logan specifically testified that, when Ellis signed the registration agreement, he was "[r]epresenting me, the broker." The agreement set forth the asking

price for the Inwood Road Kwik Kar shop as $3,650,000 and the broker fee as $150,000. The agreement further stated that "Owner is not obligated to pay Broker a fee until such time as Broker's fee is *earned* and *payable*." (emphasis in original) "Earned" was defined as when the owner entered into a binding agreement to sell or lease all or part of the property at any price to the prospective purchaser or if the owner breached the agreement. "Payable" was defined as at the earlier of the closing and funding of the sale or upon the owner's breach. Ultimately, no deal resulted between Privett and Piracha.

Then, in July 2015, James Goff approached Ellis seeking to buy a Kwik Kar. Goff stated that a friend told him Ellis was the "proper channel" to go through to purchase a Kwik Kar shop. Ellis, Goff, and Privett met together later that month and Goff and Privett came to an agreement in principal for the sale of the Inwood store (the "Inwood deal"). Privett testified that, if Ellis had not brought him and Goff together, the sale would not have occurred.

Ellis died on October 20, 2015. Following his death, Tracey Dunham, who worked for Kwik Industries at that time, handled all of the negotiations and communications between Goff and Privett and their attorneys. Her work included processing the file by negotiating the contract, making sure the due diligence was delivered, and making sure the parties adhered to the timeframes set out in the contract. Dunham testified she worked with Ellis on at least 160 deals during her career working at Kwik Industries, and Logan confirmed that Ellis employed Dunham to do this type of work on his transactions. In addition to being employed by Kwik, Dunham was also a registered real estate agent with Keller Williams Brokerage. Dunham testified she never worked for Logan and, although Logan was the sponsoring broker and, as such, "directed" the Inwood deal, Dunham said she processed the file as an employee of Kwik and not on behalf of Logan. In an email to Logan, Dunham referred to the Inwood deal as "the deal I have been processing for

Ray." Logan conceded she had no formal employment relationship with Dunham, but stated she felt that Dunham was performing the processing work for her as an independent contractor.

On October 23, Dunham sent an email to others working at Kwik about the Inwood deal stating,

> The Registration Agreement executed by Ray and Kelly Privett names Ray's previous buyer, Munawar Piracha who went away; however, I spoke with Ray's broker Alma Logan and Kelly can scratch through that name and insert the new buyer's name. Alma will initial the new buyer's name change as Ray's broker. Any commission paid would have the 1% broker's fee deducted as well as a $75 E&O charge.

When one of the email recipients asked Dunham for a copy of Ellis's agreement with Logan, Dunham forwarded the email chain to Logan stating that she could not find the written agreement "between Ray and RE/MAX" but she knew that "the 1% of each commission with a desk fee of $500 was a verbal agreement as of years ago." Logan responded that "[i]t was a hand shake kind of deal since I have been working with him for over 15 years."

Several weeks later, Logan sent Dunham an email informing her that she spoke to the Texas Real Estate Commission about the Inwood deal. She stated,

> Since the Registration was completed by Ray and he was the precurring [sic] cause to bring the 2 parties together, our office is protected. However, unfortunately since Ray technically no longer has an active license, the contract cannot have his name on it. Our Brokerage can be entitled to the transaction since the Broker owns any listings, clients, etc but we need to find a solution.

When asked at trial whether, at the time she sent the email, she was trying to find a way to pay the Estate for the deal, Logan responded, "Correct." Logan further confirmed that, when she changed the Registration Agreement to show a different buyer and to add her initials as the broker, she was not planning to keep the broker fee commission and she did not "form that idea" until later.

Dunham continued to do the bulk of the work on the deal and she testified that Logan handled approximately 5%-10% of the transaction. Privett testified that, during the contract

negotiations, he had one short conversation with Logan to give her his contact information. Goff testified he'd never heard of Logan before the Estate brought this suit.

Although Dunham drafted the original sales contract, Logan later revised it to show RE/MAX as the broker in the footer of the document instead of Keller Williams. Dunham stated this was the only change to the contract Logan made. The principal broker listed on the contract was RE/MAX Real Estate Associates and Logan was listed as the agent. The broker license number listed on the agreement was Logan's personal broker license number rather than the separate corporate license number for Logan Real Estate Associates. The final contract was executed in January 2016 and the deal closed five months later.

According to a June email from Dunham, Logan was "working on getting the checks out" either by Fed Ex or mail and they would be sent to Raynette Randall, Ellis's daughter and the executor of the Estate. Logan testified that, by June, she had decided she would not pay the Estate 99% of the broker's fee, but rather she would pay only "some portion" of the fee. She stated she was willing to give the Estate some of the money as a gift or referral fee, but she did not feel it should receive the full amount. Logan conceded she paid the Estate the full commission on a separate deal that closed after Ellis died, but stated that was because, in that transaction, Ellis's name was on the sales contract. Logan testified that one of the terms of her oral agreement with Ellis was that he "write the contract" for his transactions. Logan further stated that, sometime after the June email, she decided she would not disburse any of the broker's fee commission to the Estate. Logan did, however, offer to pay Dunham 10% of the commission for her processing work and she asked Dunham to send her an invoice. Dunham said she did not know until then that Logan intended to keep more of the commission than the 1% allocated to her pursuant to the oral agreement with Ellis. Privett testified he had assumed Ellis was going to receive the entire commission for the sale of the Inwood shop as he had for all the other sales he had done for Privett

and Logan never informed him that this would not be the case. When asked if he would have agreed to continue working with Logan if she had told him she intended to keep the entire commission, Privett responded that he "would have reevaluated the situation" because, based on how little work Logan did, he did not feel she was entitled to "any kind of commission of that size or magnitude."

Logan deposited the entire broker's fee into her company's account. She testified that most of the money from her transactions and her commissions go "straight in to the company" and she would "just take draws to live on." Logan further testified that her company had been operating at a loss every month since May 2016. Between May 2016 when the deal closed and September 2017, Logan paid herself $115,000 and she stated that some of that money would have been from the money she received as the broker's commission for the Inwood deal.

The Estate brought this suit asserting claims for breach of contract, money had and received, promissory estoppel, and quantum meruit. In addition, The Estate asserted a claim for breach of fiduciary duty as assignee of the interests of K&M Privett, Inc. Following a bench trial, the trial court concluded that Logan was liable for breach of contract and awarded $135,000[1] in actual damages along with attorney's fees and post-judgment interest. All other relief was denied. After requesting and receiving findings of fact and conclusions of law, both Logan and the Estate appealed.

---

[1] The amount awarded appears to be based on the Estate's concession during closing arguments that Logan could be entitled to keep 10% of the commission pursuant to Dunham's testimony that Logan did 5% to 10% of the work on the deal. The Estate does not challenge the amount of actual damages found by the trial court.

**Analysis**

**I. Breach of Contract**

In her first two issues, Logan contends the trial court erred in concluding she breached an agreement to share the broker's fee commission with Ellis because (1) Ellis died before any fee was earned, (2) his death terminated the fee sharing agreement, and (3) the fee was earned by and paid to RE/MAX so Logan never personally earned or received a fee she could share. Logan lists numerous "subpoints" within her issues in which she challenges the legal and factual sufficiency of the evidence supporting the trial court's findings of fact and conclusions of law.

In reviewing a legal sufficiency challenge to the evidence, we credit evidence that supports the verdict if a reasonable factfinder could have done so and disregard contrary evidence unless a reasonable factfinder could not have done so. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 115 (Tex.2009); *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We consider all the evidence in the light most favorable to the prevailing party and indulge every reasonable inference in that party's favor. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 520–21 (Tex. 2003). The evidence is legally sufficient if "more than a scintilla of evidence exists." *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Litton Loan Servicing, L.P. v. Manning*, 366 S.W.3d 837, 840 (Tex. App.—Dallas 2012, pet. denied). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010).

To evaluate a factual sufficiency challenge, we consider and weigh all the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We can set aside a verdict

only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id*. We must not substitute our judgment for that of the factfinder and should remain cognizant that the factfinder is the sole judge of witness credibility. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Logan first argues the trial court erred in concluding she breached her agreement with Ellis because the evidence showed no broker's fee commission was "earned" before Ellis died. Logan specifically challenges the sufficiency of the evidence to support the trial court's findings that (1) the oral commission-sharing agreement applied to "any real estate transaction procured by Ellis handled by Logan as the broker of record," (2) Ellis was the procuring cause of the sale and, as such earned a contingent right in the attendant commission, (3) Ellis's right to his share of the commission vested when he brought Goff and Privett together, (4) Ellis's death did not terminate his right to the commission, and (5) neither the Registration Agreement nor the sales contract affected Ellis's entitlement to the fee.

Logan contends that, because Ellis was dead, the only evidence of the terms of their oral contract was her testimony in which she stated the agreement included the requirement that Ellis write the sales contract. Because it is undisputed that Dunham drafted the sales contract for the Inwood deal after Ellis died, Logan states the evidence conclusively showed he did not fulfill his part of the agreement. The trial court was free to disbelieve Logan's testimony about this additional term of the oral agreement, however, based on the other evidence presented at trial.

After Ellis died, Logan communicated repeatedly with Dunham about the broker's fee commission and at no point mentioned a requirement that Ellis be the one to "write the contract." Even in her deposition before trial, Logan stated the terms of the agreement were only that, in exchange for operating under her brokerage license, Ellis pay her a desk fee, an E&O insurance fee, and 1% of the commissions on his transactions. It was not until trial that Logan stated for the

first time their agreement included a requirement that Ellis write the contract. These facts, along with Logan's testimony that she did not decide to retain the commission until well after Ellis died, support a finding that the oral agreement did not require Ellis to write the contract and this additional requirement was, instead, created by Logan after Ellis died to justify her keeping the commission.

Logan also points to the Registration Agreement provision which states that the broker's fee is not earned until the owner of the property enters into a binding agreement with the prospective purchaser. Because it is undisputed that the written sales contract for the Inwood deal was not signed until after Ellis died, Logan argues the evidence shows he could not have earned the broker's fee commission prior to his death. As Logan acknowledged at trial, however, the Registration Agreement was solely between the broker and the owner and did not include Ellis as the sales agent. Although Ellis signed the agreement, he was not a licensed broker. Logan testified she was the broker for the Inwood deal and Ellis signed the agreement as her representative. Ellis, therefore, was not a party to the Registration Agreement.

In addition, the Registration Agreement dictated only when Logan became entitled to receive, and when Privett became obligated to pay, the broker's fee commission. Ellis's receipt of his share of the commission was obviously contingent on the sale closing. But the Registration Agreement said nothing about Ellis's rights or obligations as the sales agent or Logan's and Ellis's rights and obligations vis a vis each other with respect to the commission ultimately paid. Because the contractual relationship between Logan and Privett was separate from the contractual relationship between Logan and Ellis, the trial court properly concluded the Registration Agreement had no bearing on when Ellis earned his share of the commission. *See UL, Inc. v. Pruneda*, No. 01-09-00169-CV, 2010 WL 5060638, at *13-14 (Tex. App.—Houston [1st Dist.]

Dec. 9, 2010, no pet.)(mem. op,) (when agent earned share of commission determined by terms of agent's agreement with broker).

The general rule has long been that a real estate commission is earned when a ready, willing, and able buyer is produced to whom the property is eventually sold on terms that are satisfactory to the seller. *Goodwin v. Gunter*, 185 S.W. 295, 296 (1916). As the Texas Supreme Court has stated, "[t]his is but a rule of fairness and right." *Id.* Although parties may expressly agree to different terms by which the commission is earned, Logan produced no credible evidence that she and Ellis agreed to different terms regarding when the commission was earned in the contract between them. The evidence showed, and the trial court found, the agreement was that, in exchange for Logan acting as Ellis's sponsoring broker, Logan would receive a $500 per month "desk fee," payment for Ellis's E&O insurance, and 1% of the commissions paid on Ellis's transactions. With respect to the Inwood deal, Ellis had a longstanding relationship with Privett and he procured Goff as a ready, willing, and able buyer for Privett's property. Both Privett and Goff stated they came to Ellis because of his reputation in the community and his connection to Kwik Kar. Logan had no relationship with either Privett or Goff, and Privett testified the sale of the Inwood property to Goff would not have occurred without Ellis's efforts in bringing them together. Logan would not have been involved with the sale at all but for her arrangement with Ellis. The evidence is legally and factually sufficient, therefore, to support the trial court's conclusion that the Inwood deal was an Ellis transaction for which he earned his commission pursuant to their agreement.

Logan next argues the evidence does not support the trial court's judgment because the oral commission sharing agreement was one for personal services that terminated upon Ellis's death. Logan's argument is without merit. Contractual obligations generally survive the death of one of the parties. *Cardwell v. Sicola-Cardwell*, 978 S.W.2d 722, 726 (Tex. App.—Austin 1998, pet.

denied). The exception to this rule is a contract for "personal services." *Id.* "This is because performance of this type of contractual obligation depends on the existence of a particular person, or because one party relies on the skill or character of the other party, or because the contract is based on a personal confidence between the parties. *Id.*

In this case, even if we were to conclude the oral commission sharing agreement was a contract for personal services, the evidence showed Ellis fully performed his obligations under the contract before he died. The only service that was personal to Ellis was his ability to bring together a buyer and seller for the purchase of a Kwik Kar shop because of his reputation as the "proper channel" to go through for that type of transaction. Logan conceded at trial that, once this was done, Ellis employed Dunham to do a lot of the "transactional work," including handling the clerical work and communications between the parties, and it was "a given" that Dunham would perform this work on the Inwood deal. Because Ellis completed all of his obligations with respect to the Inwood deal before he died, the trial court properly concluded Logan's obligation to share the broker's fee commission with Ellis survived Ellis's death.

This reasoning similarly disposes of Logan's alternative argument that the Estate committed a prior breach of the oral agreement, or treated the agreement as terminated, when it stopped paying Ellis's $500 monthly desk fee after Ellis died. When one party to a contract commits a material breach of that contract, the other party is excused from any obligation to perform. *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 646 (Tex. App.— Dallas 2015, no pet.). Dunham testified that, after Ellis died, she was instructed to stop paying Ellis's desk fee to Logan because, upon his death, Ellis no longer had an active real estate license. As stated above, however, the evidence showed Ellis completed all of his obligations under the oral contract with Logan prior to his death thus entitling him to his share of the commission if and when it was paid to Logan. Because Ellis had already fulfilled his obligations at the time of his

death, the failure to continue paying the desk fee after he died cannot be considered a prior breach or a termination of the agreement that would deprive the Estate of Ellis's already earned commission.

Finally, Logan contends the evidence is insufficient to support the trial court's findings and conclusions regarding her personal liability because it is "undisputed" that Ellis's commission-sharing agreement was with RE/MAX rather than her personally, and the Inwood deal commission was paid solely to RE/MAX rather than her. We find this argument disingenuous. Not only were both those alleged facts disputed, the record is replete with evidence that Logan personally served as Ellis's sponsoring broker and she personally received the broker's fee commission for the Inwood deal.

Throughout the trial, Logan repeatedly made statements indicating that Ellis worked for her personally, (i.e. "I held his salesperson's license"). Furthermore, she confirmed that their commission-sharing agreement allowed Ellis to work under her brokerage license. When specifically asked whether Ellis was her agent, she responded that he was. In discussing the Registration Agreement for the Inwood deal, Logan stated that Ellis signed the agreement as "a representative of mine" and he was "[r]epresenting me, the broker."

To support her contention that she was not Ellis's sponsoring broker, Logan points to the Inwood deal documents listing the broker as "RE/MAX Real Estate Associates." Logan acknowledged at trial that the RE/MAX trade name is used by multiple brokers, realtors, and real estate groups. Throughout the trial, both the witnesses and the lawyers used the RE/MAX name interchangeably with Logan's. The fact that Logan used RE/MAX as a trade name for herself personally in addition to her company is amply demonstrated by the sales contract for the Inwood

–12–

deal which lists "RE/MAX Real Estate Associates" as the broker along with Logan's personal broker license number, not her company's.[2]

As for the broker fee payment being made to RE/MAX, Logan testified the Inwood deal commission went into her company's checking account the same way it did for most of her transactions. Logan made no distinction between her personal broker transactions and her company's. Logan used the money in her company account to live on and, when discussing her withdrawals, she was asked, "But you personally were paying yourself [out of the company account] approximately $115,000 since the closing of the Inwood deal, correct?" to which she replied "As the broker, yes."

Based on the foregoing, we conclude the evidence was more than sufficient to support the trial court's conclusions that (1) Logan had a personal commission-sharing agreement with Ellis by which Ellis operated as a real estate agent under Logan's personal brokerage license, (2) Logan personally received the entire commission payment from the Inwood deal, and (3) Logan breached her agreement with Ellis by failing to remit to the Estate the portion of the Inwood deal commission owed to Ellis pursuant to their agreement. We resolve Logan's first two issues against her.

## II. Breach of Fiduciary Duty

In a single issue on cross-appeal, the Estate contends the trial court erred in denying its claim for breach of fiduciary duty because such a result was "wholly contradictory to the evidence adduced at trial." The Estate asks that, based on the evidence, we render judgment in its favor on

---

[2] In her appellate brief, Logan contends one of the exhibits submitted by the Estate shows the license number on the sales contract was not her broker number, but a sales agent number. This is a clear misrepresentation of the record. The document to which Logan refers is a printout of a Texas Real Estate Commission listing for Logan Real Estate Associates LLC. The broker number for the company is listed as 9001880. In the space provided for "Name (License Type)" of the company's designated officer it states "Logan, Alma Sofia (Broker)" followed by the license number 447998, which is the same license number listed for the broker on the Inwood deal contract. The company's sales agents are listed in a different section of the printout, and Logan is not among them. Accordingly, this evidence definitively shows the license number on the Inwood deal sales contract was Logan's personal broker number, not her company's, and not a sales agent number.

this claim. This argument is not well taken because, even if we were to conclude the evidence supported a finding that Logan was liable for breach of fiduciary duty, the trial court's failure to render judgment in favor of the Estate on that claim was harmless. Under the facts of this case, the Estate could not recover any additional damages for breach of fiduciary duty over and above what it recovered on its claim for breach of contract.

Prior to bringing this suit, the Estate obtained an assignment from K&M Privett of any and all claims it could assert against Logan arising out of the Inwood deal. Based on this assignment, the Estate asserted a claim for breach of fiduciary duty contending that Logan breached her duty as the company's broker by failing to inform it of her intention to retain the entire commission.

In its petition, the Estate asserted explicitly that its breach of fiduciary duty claim was an alternative, rather than additional, theory of recovery to its breach of contract claim. At trial, the Estate's counsel conceded there were no damages as a result of Logan's breach of fiduciary duty other than her receiving the commission payment and the Estate only sought to have the payment disgorged. When a plaintiff pleads alternative theories of liability, and the defendant's acts result in a single injury, the plaintiff is entitled to judgment only on one of the theories – generally the one that affords the greatest relief. *Saden v. Smith*, 415 S.W.3d 450, 465-66 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). This principle is known as the one-satisfaction rule: for one injury there can be only one recovery. *Id*. at 465. In this case, because the Estate neither alleged nor proved separate tort damages resulting from the breach of fiduciary duty, the breach of contract theory provided the Estate with the greatest recovery based on the availability of attorney's fees. *See Bruce v. Cauthen*, 515 S.W.3d 495, 516 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Since the trial court's judgment in favor of the Estate on its claim for breach of contract provided the Estate with the most relief to which it could be entitled, we resolve the Estate's cross-appeal against it.

–14–

## III. Attorney's Fees

In her third issue, Logan contends the evidence is legally and factually insufficient to support the trial court's award of attorney's fees to the Estate. The Estate requested an award of attorney's fees under chapter 38 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (attorney's fees recoverable on claim for breach of an oral or written contract). At the conclusion of the trial, the Estate's counsel, William Richmond, testified regarding his experience as a commercial litigator in Dallas and his knowledge of appropriate, reasonable, and necessary attorney's fees. He stated that the rate he charged for his services at the beginning of the case in 2017 was $325 per hour which rose to $355 in 2018; his co-counsel's rate was $305 per hour which rose to $325 in 2018; and the rate for his paralegals was $110 per hour which rose to $130 in 2018. He further stated he was personally familiar with the hours spent on the case by him, his co-counsel, and his staff and, because of the minimal number of motions and depositions, the total number of hours spent prior to trial was eighty-four, resulting in $26,000 of accrued attorney's fees for that time period. Richmond also estimated that, based on the briefing and other legal work done during trial, the total amount of attorney's fees accrued through trial would be $33,000. Richmond testified that, based on the *Arthur Anderson* factors, this amount was reasonable and the work done was necessary.

With respect to segregating the fees, Richmond stated the case involved two separate types of claims: contractual/quasi-contractual and breach of fiduciary duty. According to Richmond, all the contractual and quasi-contractual claims were substantially intertwined with each other and most of the work performed on the breach of fiduciary duty claim was intertwined with the work done on the contractual claims. Ultimately, Richmond stated 95% of the work done by his office was related directly to, or was substantially intertwined with, the contractual claims for which a statutory attorney fee award was available under chapter 38.

–15–

Logan argues the Estate's evidence in support of the attorney fee award is insufficient under the standards recently set forth by the Texas Supreme Court in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP,* 578 S.W.3d 469 (Tex. 2019). But as *Rohrmoos* noted, and Logan fails to acknowledge, the evidentiary requirements to support an award of attorney's fees under chapter 38 are completely different when the issue is presented to the trial court for determination rather than to a jury. *Id*. at 490 n.9; *Scott Pelley P.C. v. Wynne*, 578 S.W.3d 694, 705 (Tex. App.—Dallas 2019, pet. denied). Where the attorney's fee claim under chapter 38 is made in a bench trial, the trial court may take judicial notice of the usual and customary fees and of the contents of the case file, presume the usual and customary charges for the work performed are reasonable, and set the fees based on such judicial notice without receiving further evidence. *See Wynne*, 578 S.W.3d at 705; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 38.004. The court may take judicial notice with or without the request of a party and such notice constitutes some evidence to support the award. *Long Trusts v. Atlantic Richfield Co.*, 893 S.W.2d 686, 687-88 (Tex. App.—Texarkana 1995, writ denied); *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 626 (Tex. App.—Dallas 1987, writ denied). In the absence of other evidence supporting the award, we will presume the trial court took such judicial notice in determining the amount of fees awarded. *Wynne*, 578 S.W.3d at 705. We will not overturn an award of attorney's fees unless it constitutes a clear abuse of discretion. *Long Trusts*, 893 S.W.2d at 688.

In making its award, the trial court indicated it properly took into consideration the amount of work performed on claims for which attorney's fees were not recoverable and held that the total amount of reasonable and necessary fees incurred post-segregation was $34,200. Logan argues this award must be an abuse of discretion because it exceeds the total amount of fees proven up by the Estate's counsel at trial. Richmond's testimony was that the total amount of fees accrued by the Estate through trial of the case would be $33,000. But, because the fee award was being made

by the trial court under chapter 38, this evidence was not conclusive as to the amount. *See Lee v. Perrez*, 120 S.W.3d 463, 469 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Furthermore, the record shows that, at the conclusion of the trial, the court requested additional briefing from both parties and the Estate's counsel engaged in other post-trial legal work for which additional fees would have accrued. We presume the trial court took judicial notice of this post-trial work and Logan presented no evidence that would contradict the reasonableness and necessity of the total amount awarded. We conclude the trial court's award of $34,200 in attorney's fees was not an abuse of discretion. We resolve Logan's third issue against her.

We affirm the trial court's judgment.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

190043F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ALMA LOGAN AND LOGAN REAL ESTATE ASSOCIATES, LLC, Appellants

No. 05-19-00043-CV     V.

RAYNETTE RANDALL, AS EXECUTOR OF THE ESTATE OF RAY ELLIS, Appellee

On Appeal from the 95th District Court, Dallas County, Texas
Trial Court Cause No. DC-16-12590.
Opinion delivered by Justice Reichek. Justices Pedersen, III and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 27th day of February, 2020.